UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
UNITED STATES SECURITIES AND EXCHANGE                       :
COMMISSION,                                                 :
                                                            :
                                      Plaintiff,            :
                                                            :
                -against-                                   :
                                                            :
FERNANDO PASSOS,                                            :
                                                            :
                                      Defendant.            :
------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/21/2024
```

1:22-cv-3156-GHW

<u>MEMORANDUM OPINION &
ORDER</u>

GREGORY H. WOODS, United States District Judge:

Defendant Fernando Passos ("Defendant") is a former executive at IRB Brasil Resseguros S.A. ("IRB"), a Brazilian reinsurance company whose stock traded on a Brazilian exchange. A large number of U.S. investors owned IRB stock. In February 2020, IRB's share price fell after a short-seller publicly questioned the strength of IRB's finances, citing, in part, general comments on the reinsurance industry from Warren Buffett, Chairman and CEO of Berkshire Hathaway Inc. ("Berkshire"). In response, Defendant allegedly planted a false story in the press that Berkshire, far from being pessimistic about the reinsurance industry, had just recently made significant investments in IRB. But the plan enjoyed only short-term success: IRB's share price rebounded while Defendant's story remained uncorrected, but plummeted again after Berkshire denied any involvement with IRB. The SEC now brings this enforcement action against Defendant, alleging that he violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b–5. The SEC also claims, in the alternative, that Defendant violated Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), by aiding and abetting IRB in violating Section 10(b).

Defendant has moved to dismiss the SEC's complaint for lack of personal jurisdiction and for failure to state a claim. The principal question before the Court is whether Section 10(b) provides the SEC a cause of action based on foreign transactions on a Brazilian exchange. The Court concludes that it does. In 2010, the Supreme Court held that Section 10(b) does not reach extraterritorial transactions, *see Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 267 (2010), but a subsequent amendment to the Exchange Act's jurisdiction provision provides a clear, affirmative indication that Congress now intends otherwise.

Accordingly, because Defendant's alleged contacts with the United States support the exercise of personal jurisdiction, and because his alleged dissemination of the false Berkshire story to the press constitutes a fraudulent "scheme" in violation of Rule 10b-5(a), Defendant's motion to dismiss the SEC's complaint is DENIED.

## I.    BACKGROUND

### a.  Facts Alleged in the Complaint[1]

#### i.  IRB and Defendant Passos

IRB Brasil Resseguros S.A. ("IRB") is a Brazilian reinsurance company headquartered in Rio de Janeiro, Brazil. Compl. ¶ 8. IRB's stock trades on the "B3 S.A. – Brasil, Bolsa, Balcão," a Brazilian stock exchange located in São Paulo. *Id.* The Complaint does not allege any domestic transactions in IRB stock. *See id.* ¶¶ 8, 44, 46.

Fernando Passos ("Defendant") was, at all relevant times, IRB's Executive Vice President of Finance and Investor Relations. *Id.* ¶ 7. That made Defendant "IRB's most senior financial officer," responsible for, among other things, "IRB's communications with investors." *Id.*

---

[1] The facts are taken from the complaint, Dkt. No. 1 ("Complaint" or "Compl."), and are accepted as true for the purposes of this motion. *See, e.g., Town of Babylon v. Fed. Hous. Fin. Agency*, 699 F.3d 221, 227 (2d Cir. 2012); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). However, "[t]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### ii. The Alleged False Berkshire Story

In early February 2020, a short-seller of IRB stock published a letter (the "Short-Seller Letter") that questioned "the reliability and sustainability of IRB's financial results." *Id.* ¶ 9. The Short-Seller Letter cited, among other things, general commentary on the reinsurance industry from Warren Buffet, the Chairman and Chief Executive Officer ("CEO") of Berkshire Hathaway Inc. ("Berkshire"). *Id.* ¶ 10. Berkshire is a "large" and "well-known" investor in the insurance and reinsurance industries. *Id.*

After the Short-Seller Letter was published, IRB's stock price "declined significantly." *Id.* ¶ 11. In response, Defendant began thinking of ways to "bolster IRB's stock price and reassure investors that IRB was a sound investment." *See id.* ¶ 12. To that end, he allegedly resolved to create and disseminate a false story that Berkshire, which was "cited several times in the Short-Seller Letter," *id.* ¶ 15, had just recently made "substantial purchases of IRB stock" (the "False Berkshire Story"), *id.* ¶ 18. Defendant's plan was to "plant" and "spread" that false story in the media in a way that would not be "attribut[ed] to IRB." *Id.* ¶¶ 15, 20.

In truth, "Berkshire had not recently increased its position in IRB . . . and, in fact, held zero shares of IRB stock." *Id.* ¶ 16. Defendant allegedly knew that Berkshire had no position in IRB because, among other things, "on February 21, 2020, [Defendant] requested and received [a] schedule of IRB's shareholders as of February 18, 2020, [which] showed that Berkshire was not an IRB investor." *Id.* ¶ 17. The schedule did, however, show that "U.S. investors held significant investments in IRB stock," totaling "approximately $1.6 billion." *Id.* ¶ 46.

### iii. Dissemination of the False Berkshire Story

The Complaint alleges that Defendant took several concrete actions to plant and disseminate the False Berkshire Story to the media. First, Defendant allegedly created a fake shareholder schedule which "falsely showed that, as of February 18, 2020, Berkshire owned over 28 million

shares of IRB stock and was one of its largest shareholders" (the "Fake Shareholder Schedule"). *Id.* ¶ 19. On February 22, 2020, Defendant sent pictures of the Fake Shareholder Schedule to IRB's communications manager and instructed her to "work with IRB's public relations firm to leak the purported information about Berkshire's investment to a journalist who would be willing to publish it without attribution to IRB." *Id.* ¶¶ 15, 18. Defendant "not[ed] that a journalist could use the [Fake Shareholder Schedule] to confirm the purported news of Berkshire's investment." *Id.* ¶ 18. The communications manager "followed [Defendant's] instructions" and forwarded the documents to IRB's public relations firm the same day. *Id.*

On February 23, 2020, the next day, Defendant allegedly emailed the Fake Shareholder Schedule to "a member of IRB's board of directors who is also the Chairman of the board of directors of one of IRB's largest investors." *Id.* ¶ 19. He then texted IRB's communications manager "suggesting specific journalists to contact." *Id.* ¶ 20. He also texted IRB's Director of Investor Relations, instructing them that "they will plant, and [Defendant] will spread," the False Berkshire Story. *Id.*

Also on February 23, 2020, Defendant texted IRB's Director of Investor Relations that he planned to continue to "build the story" by creating a fake email from IRB's CEO to a Berkshire executive "thanking Berkshire for its recent investment in IRB" (the "Fake Berkshire Email"). *Id.* ¶¶ 20–21. Defendant created that fake email the same day. *Id.* ¶ 21. He forwarded it to IRB's communications director, who in turn forwarded it to IRB's public relations firm. *Id.*

From February 24 to February 28, 2020, Defendant traveled to Europe and the United States to meet with "investors and securities analysts . . . to reassure them of IRB's sound financial results." *Id.* ¶ 22. On February 24, 2020, while in London, Defendant allegedly told a securities analyst and two large IRB investors various versions of the False Berkshire Story. *Id.* ¶ 23.

Defendant then traveled to New York. *Id.* ¶ 25.  On February 26, 2020, while in New York, he allegedly "exchanged dozens of text messages" with IRB's communications manager instructing her "to contact various journalists through IRB's public relations firm and spread the false information concerning Berkshire's substantial investment in IRB." *Id.*  That same day, IRB's public relations firm allegedly provided the False Berkshire Story and the Fake Shareholder Schedule "to at least one journalist." *Id.* ¶ 26.  Later, IRB's communications director sent Defendant a journalist's request for IRB's "most up-to-date . . . shareholder list." *Id.*  Defendant, while still in New York, provided her images of the Fake Shareholder Schedule and the Fake Berkshire Email, which the communications manager forwarded to IRB's public relations firm. *Id.*

After trading closed on February 26, 2020, the "Brazilian media reported Berkshire's purported investment in IRB based on the false information supplied by [Defendant] through IRB's public relations firm." *Id.* ¶ 27.  The Brazilian media made another such report on February 27, 2020. *Id.*  Also on February 27, 2020, Bloomberg, a "U.S. media company," issued a report entitled "IRB Climbs Amid Report Buffett's Berkshire Increased Stake," which noted that IRB's stock price had increased "the most intraday on record" after a Brazilian publication had "reported Warren Buffett's Berkshire Hathaway increased its stake in the firm amid the stock's recent sell-off." *Id.* ¶ 28.  IRB's stock price "increased by more than 6%" from the close of trading on February 26, 2020 to the close of trading on February 27, 2020. *Id.* ¶ 29.

On February 28, 2020, Defendant, while in Boston, allegedly implied to an IRB investor that Berkshire had recently invested in IRB. *Id.* ¶ 30.  Then on March 2, 2020, IRB's CEO allegedly "made statements" to securities analysts "indicating that Berkshire had invested in IRB" on a call that included Defendant. *Id.* ¶ 31.  After the call, the Brazilian media "again reported the [False Berkshire Story]." *Id.*

According to the Complaint, "certain U.S. investors" purchased IRB shares while the False Berkshire Story was "in the public domain and had not yet been corrected by Berkshire." *Id.* ¶ 44. At that time, IRB's stock price was artificially inflated because of the False Berkshire Story. *See id.* ¶¶ 12, 29.

### iv. Berkshire Denies the Story

On March 3, after the market closed, Berkshire issued a press release "denying that it had ever invested, or had any intention of investing, in IRB." *Id.* ¶ 32.  By the close of trading on March 4, IRB's stock price had dropped "by more than 30%." *Id.* ¶ 34.  IRB announced the resignation of Defendant and IRB's CEO that same day. *Id.* ¶ 36.  By the close of trading on March 5, IRB's stock price was "down over 40% from the close of trading on March 3." *Id.* ¶ 37.

### b. Procedural History

The United States Securities and Exchange Commission ("SEC") brought this action against Defendant on April 18, 2022.  Dkt. No. 1.  On June 15, 2022, the SEC requested that the Court adjourn the initial pretrial deadlines in this case *sine die*.  Dkt. No. 8.  The SEC stated that it was "working to effect service" on Defendant in Brazil pursuant to Fed. R. Civ. P. 4(f), but that it could not "provide an exact timeframe" for the completion of service on Defendant.  *Id.*  The Court granted the SEC's application on June 17, 2022.  Dkt. No. 9.

For the next twenty-two months, the SEC provided, at the Court's request, periodic updates on its attempts to effect service on Defendant.  Dkt. Nos. 10, 12, 17.  On April 8, 2024, the SEC filed an affidavit of service stating that it had served Defendant on March 27, 2024 in accordance with Hague Service Convention protocols.  Dkt. No. 19.  That same day, the SEC and Defendant filed a joint stipulation stating, among other things, that Defendant would not "contest that service of the complaint was adequate under Fed. R. Civ. P. 4(f)(1)."  Dkt. No. 20.

On June 21, 2024, Defendant moved to dismiss the SEC's complaint for lack of personal jurisdiction and for failure to state a claim.  Dkt. No. 37 ("Motion"); Dkt. No. 38 ("Mem."); Dkt. No. 39 ("Opp."); Dkt. No. 40 ("Reply").

## II.    LEGAL STANDARD

### a.  Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2)

On a motion to dismiss pursuant to Rule 12(b)(2), the non-movant "bears the burden of demonstrating personal jurisdiction over a person or entity against whom it seeks to bring suit." *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010) (citing *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003) (*per curiam*)); *accord Bank Brussels Lamberts v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999) (same).  The non-movant's burden of proof "varies depending on the procedural posture of the litigation."  *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)).  At the pleading stage, and prior to discovery, a non-movant need only make a *prima facie* showing that jurisdiction exists.  *Id.* at 84–85; *see also Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 167–68 (2d Cir. 2015) ("In order to survive a motion to dismiss for lack of personal jurisdiction, a [non-movant] must make a prima facie showing that jurisdiction exists.") (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013)).  "This prima facie showing 'must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant.'"  *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013) (quoting *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010).

"On a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), the Court may look beyond the four corners of the complaint and consider materials outside the pleadings, including accompanying affidavits, declarations, and other written materials."  *Knight v. Standard*

*Chartered Bank*, 531 F. Supp. 3d 755, 760 (S.D.N.Y. 2021); *accord MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727–28 (2d Cir. 2012). But where, as here, "the defendant is content to challenge only the sufficiency of the plaintiff's factual allegation[s], . . . the plaintiff need persuade the court only that its factual allegations constitute a *prima facie* showing of jurisdiction." *Dorchester*, 722 F.3d at 85 (quoting *Ball*, 902 F.2d at 197). The Court "construe[s] the pleadings . . . in the light most favorable to [the plaintiff], resolving all doubts in [its] favor." *Id.* The Court does not, however, "draw argumentative inferences in the plaintiff's favor . . . [or] accept as true a legal conclusion couched as a factual allegation." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d at 673 (internal quotation marks and citation omitted).

District courts "resolving issues of personal jurisdiction must . . . engage in a two-part analysis." *Bank Brussels*, 171 F.3d at 784. First, a federal court applies the forum state's personal jurisdiction rules unless, as in this case, a federal statute "specifically provide[s] for national service of process." *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 624 (2d Cir. 2016) (quoting *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1108 (2d Cir. 1997)). Second, the Court must determine whether the exercise of personal jurisdiction over the defendant would comport with due process under the Constitution. *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59–60 (2d Cir. 2012).

Section 27 of the Exchange Act "permits the exercise of personal jurisdiction to the limit of the Due Process Clause of the Fifth Amendment." *S.E.C. v. Unifund SAL*, 910 F.2d 1028, 1033 (2d Cir. 1990); *accord Sec. & Exch. Comm'n v. Stubos*, 634 F. Supp. 3d 174, 186 (S.D.N.Y. 2022); *see also* 15 U.S.C. § 78aa(a) (providing for worldwide service of process). Due process requires that if a defendant is "not present within the territory of the forum, he [must] have certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (citation omitted). The

8

analysis has two components: "the 'minimum contacts' inquiry and the 'reasonableness' inquiry." *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996).

To establish the minimum contacts necessary to satisfy due process with respect to a nonresident defendant, the plaintiff must show that its "claim arises out of, or relates to, the defendant's contacts with the forum . . . [and that] the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2002) (internal quotation marks and citation omitted). Although foreseeability is a component of the minimum contacts analysis, "foreseeability alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause." *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295 (1980). Because the Exchange Act authorizes nationwide service of process, the relevant contacts for purposes of the "minimum contacts" analysis are those with the United States as a whole. *See, e.g.*, *S.E.C. v. Straub*, 921 F. Supp. 2d 244, 253 (S.D.N.Y. 2013) ("When the jurisdictional issue flows from a federal statutory grant that authorizes suit under federal-question jurisdiction and nationwide service of process, . . . the minimum-contacts test in such circumstances looks to contacts with the entire United States rather than with the forum state." (quotation omitted)) (collecting cases); *Chew v. Dietrich*, 143 F.3d 24, 28 n.4 (2d Cir. 1998) (explaining that "under the Fifth Amendment the court can consider the defendant's contacts throughout the United States").

"The second part of the jurisdictional analysis asks whether the assertion of personal jurisdiction comports with 'traditional notions of fair play and substantial justice'—that is, whether it is reasonable under the circumstances of the particular case." *Bank Brussels Lambert*, 305 F.3d at 129 (citations omitted). If the defendant's contacts with the forum rise to the level of "minimum contacts," a defendant may defeat jurisdiction only by presenting "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King Corp. v.*

*Rudzewicz*, 471 U.S. 462, 477 (1985).  The burden is on the defendant to demonstrate that the Court's exercise of jurisdiction would "make litigation 'so gravely difficult and inconvenient' that a party unfairly is at a 'severe disadvantage' in comparison to his opponent.'"  *Id.* at 478 (quotation omitted).  In determining whether the exercise of personal jurisdiction would be unreasonable, the court must evaluate "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies."  *Metro. Life Ins.*, 84 F.3d at 568 (citing *Asahi Metal Indus. Co. v. Super. Ct.*, 480 U.S. 102, 113–14 (1987)).

### b.  Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6)

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A defendant may move to dismiss for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  In a motion to dismiss under Rule 12(b)(6), the court accepts as true the facts alleged in the complaint and draws all reasonable inferences in the plaintiff's favor.  *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 110–11 (2d Cir. 2010).  However, "[t]he tenet that a court must accept as true a complaint's factual allegations does not apply to legal conclusions."  *Ashcroft*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

To survive dismissal under Rule 12(b)(6), a complaint must allege sufficient facts to state a plausible claim.  *Lynch v. City of New York*, 952 F.3d 67, 74 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 678).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (quoting *Iqbal*, 556 U.S. at 678).  "Threadbare recitals of the elements of a cause of action, supported

by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

On a motion to dismiss, a court must generally "limit itself to the facts stated in the complaint." *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 192 (2d Cir. 2006). However, the court may also consider "matters of which judicial notice may be taken." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (citation omitted). At the motion to dismiss stage, courts have "taken judicial notice of materials in the public record, such as . . . regulatory filings," but only "for the limited purpose of noting what the documents state, rather than to 'prove the truth of their contents.'" *Hesse v. Godiva Chocolatier, Inc.*, 463 F. Supp. 3d 453, 462–63 (S.D.N.Y. 2020) (quoting *Ace Arts, LLC v. Sony/ATV Music Pub., LLC*, 56 F. Supp. 3d 436 (S.D.N.Y. 2014)).

Defendant attaches three exhibits to his motion to dismiss, Dkt. Nos. 38-1, 38-2, 38-3, and requests that the Court take judicial notice of their contents, Mem. at 2. Exhibit 1 is Berkshire's Form 10-K for the fiscal year ended December 31, 2019. Dkt. No. 38-1. Courts may take judicial notice of Form 10-K filings, *e.g.*, *Sec. & Exch. Comm'n v. Fiore*, 416 F. Supp. 3d 306, 328–29 (S.D.N.Y. 2019), though only to "establish that the matters had been publicly asserted," rather than for the truth of their contents, *id.* (quoting *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 424 (2d Cir. 2008)). Accordingly, the Court judicially notices Defendant's Exhibit 1, but not for the truth of its contents.

Exhibit 2 to Defendant's motion to dismiss is purportedly "an extract from IRB's year-end 2019 financial statements," Mem. at 5 n.1, translated from the original Portuguese, Dkt. No. 38-2 at 1. Defendant does not claim that the translation is a certified translation. *See id.* (stating that the

11

extract is "[a] free translation of the original report in Portuguese as filed in Brazil"). While courts may, in appropriate circumstances, take judicial notice of certified translations of foreign-language documents, *see Guity v. Santos*, No. 18-CV-10387 (PKC), 2019 WL 6619217, at *2 (S.D.N.Y. Dec. 5, 2019), courts do not take judicial notice of foreign-language documents unaccompanied by a certified translation, *see In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000*, No. MDL 1428 SAS, 2003 WL 21659368, at *3 n.5 (S.D.N.Y. July 15, 2003) ("The translation of a legal document in judicial proceedings must be certified by a sworn court interpreter/translator."). Accordingly, the Court will not take judicial notice of Defendant's Exhibit 2.

Exhibit 3 to Defendant's motion to dismiss is a chart listing IRB's stock prices for the first three months of 2020, taken from Yahoo! Finance. Dkt. No. 38-3. The SEC does not dispute the accuracy of the chart, or that the Court may consider it. *See generally* Opp. "[A] district court may take judicial notice of well-publicized stock prices without converting the motion to dismiss into a motion for summary judgment." *Barilli v. Sky Solar Holdings, Ltd.*, 389 F. Supp. 3d 232, 248 n.11 (S.D.N.Y. 2019) (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 166 n.8 (2d Cir. 2000)). Accordingly, the Court will take judicial notice of the stock prices set forth in Exhibit 3. *See In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 512 n.5 (S.D.N.Y.), *opinion corrected on other grounds*, 612 F. Supp. 2d 397 (S.D.N.Y. 2009) (taking judicial notice of historical stock price information listed on Yahoo! Finance).

## III.    DISCUSSION

Because "personal jurisdiction is a threshold determination that must precede [the] merits," *In re Rationis Enterprises, Inc. of Panama*, 261 F.3d 264, 268 (2d Cir. 2001) (citation omitted), the Court first addresses, and rejects, Defendant's motion under Rule 12(b)(2) to dismiss this action for lack of personal jurisdiction. The Court then turns to, and again rejects, Defendant's motion under Rule 12(b)(6) for failure to state a claim.

### a. Personal Jurisdiction

The SEC has met its burden, at this stage, of establishing a *prima facie* case of personal jurisdiction over Defendant, because the amended complaint pleads sufficient minimum contacts with the United States, *Bank Brussels*, 305 F.3d at 127, and that the exercise of personal jurisdiction over Defendant is reasonable under the circumstances, *Metro. Life Ins.*, 84 F.3d at 567.

### i. Defendant's Contacts with the United States Suffice for the Exercise of Personal Jurisdiction

The Complaint alleges sufficient contacts with the United States to support the exercise of personal jurisdiction. "One circumstance" supporting the exercise of personal jurisdiction "is where a defendant has acted in such a way as to have 'caused consequences' in the forum state." *Unifund*, 910 F.2d at 1033 (quoting Restatement (Second) of Conflict of Laws § 37 (1989)). Defendant's alleged conduct meets this standard because it "had a rather direct and an unmistakably foreseeable effect within the United States." *Id.*; *Stubos*, 634 F. Supp. 3d at 187. When Defendant allegedly planted and disseminated the False Berkshire Story in the media, Compl. ¶¶ 15–21, 24–26, he allegedly knew, having received IRB's most recent shareholder list, that U.S. shareholders held significant investments in IRB stock, *id.* ¶¶ 17, 46 (alleging that U.S. investors held "approximately $1.6 billion" in IRB stock). Defendant also took significant steps while in the U.S. to further plant and disseminate the false story by, among other things, sending "dozens" of text messages from New York to IRB's communications manager instructing her to spread the False Berkshire Story to "various journalists," *id.* ¶ 25; *see also id.* ¶ 28 (alleging that Bloomberg, a U.S. media company, took up and reported on the False Berkshire Story), and sending IRB's communications manager the Fake Shareholder Schedule and Fake Berkshire Email so that she could forward them to a journalist, *id.* ¶ 26. Defendant's alleged actions, both within and outside of the U.S., "created the near certainty that United States shareholders, who could reasonably be expected to hold [the company's] securities, would be adversely affected." *Unifund*, 910 F.2d at 1033; *see also* Compl. ¶ 44 (alleging that

"U.S. investors[] purchased shares of IRB's stock while the false Berkshire information was in the public domain and had not yet been corrected by Berkshire"). Accordingly, Defendant's actions establish, at this stage, the minimum contacts required for the exercise of personal jurisdiction. *See Stubos*, 634 F. Supp. 3d at 187; *S.E.C. v. Softpoint, Inc.*, No. 95 CIV. 2951 GEL, 2001 WL 43611, at *6 (S.D.N.Y. Jan. 18, 2001).

Defendant's attempts to downplay his contacts with the U.S. are unavailing. Defendant contends that the false Berkshire "rumor" "had no effect in the United States" because its effect on IRB's share price took place exclusively on a Brazilian stock exchange. Mem. at 20–21. He also contends that his alleged conduct in New York was not "purposefully directed" towards the U.S., Mem. at 20 (quoting *U.S. S.E.C. v. Sharef*, 924 F. Supp. 2d 539, 545 (S.D.N.Y. 2013)), because the texts and falsified documents that he sent while in New York were sent to Brazil, *see id.* (arguing that "Defendant simply happened to be in New York City"). The Court disagrees. According to the Complaint, Defendant was fully aware that his dissemination of the False Berkshire Story would be felt, in no small part, by United States investors. *See* Compl. ¶¶ 46 (alleging that U.S. investors held approximately $1.6 billion in IRB shares), 17 (alleging that Defendant knew that U.S. investors held $1.6 billion in IRB stock), 44 (alleging that U.S. investors purchased shares in IRB while the false rumor was in the public domain).[2] And he took significant steps while in the United States in furtherance of that plan. *Id.* ¶¶ 25, 26. At this stage, that suffices to plead that Defendant's conduct was purposefully directed at the United States. *See, e.g.*, *Stubos*, 634 F. Supp. 3d at 187–88 (exercising personal jurisdiction over foreign defendant whose conduct had a direct and unmistakably foreseeable effect within the United States).

### ii. The Exercise of Personal Jurisdiction over Defendant is Reasonable under the Circumstances

---

[2] As explained *infra*, Defendant does not dispute that the Complaint adequately alleges that he knew of the significant investment in IRB from U.S. investors. *See* Mem. at 17.

This case is not "the rare case where the reasonableness analysis [under the Due Process Clause] defeats the exercise of personal jurisdiction." *Id.* at 188 (quoting *Straub*, 921 F. Supp. 2d at 259). Where, as here, a non-diversity action is brought under a federal law which provides for nationwide service of process, "[t]he reasonableness inquiry is largely academic . . . because of the strong federal interests involved." *Id.* at 187 (quoting *Straub*, 921 F. Supp. 2d at 259); *accord Nutriband, Inc. v. Kalmar*, No. 19CV2511NGGSJB, 2020 WL 4059657, at *3 (E.D.N.Y. July 20, 2020). Defendant only meaningfully disputes the first factor of the reasonableness analysis, "the burden that the exercise of jurisdiction will impose on the defendant," *Metro. Life Ins.*, 84 F.3d at 568, arguing that the burden of this action is significant because "he speaks English sparingly, lives in Brazil, and has no ties to the United States," Mem. at 22. But that argument provides him "only weak support, if any, because 'the conveniences of modern communication and transportation'" ease whatever burdens Defendant's native language and residence might have presented decades ago. *Bank Brussels*, 305 F.3d at 129–30; *accord Softpoint*, 2001 WL 43611, at *6 (similar, noting also that such arguments lose force in civil, rather than criminal, litigation).

Any such support is outweighed by the other factors. On the second factor, "'[t]he federal interest in adjudicating the dispute is clear and substantial' because the SEC's claims are 'brought under the federal securities laws, an area of strong federal concern that falls at the center of Congress' commerce power.'" *S.E.C. v. Syndicated Food Servs. Int'l, Inc.*, No. 04-CV-1303 NGG ALC, 2010 WL 3528406, at *3 (E.D.N.Y. Sept. 3, 2010) (quoting *Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 104 F. Supp. 2d 279, 286 (S.D.N.Y. 2000)). Defendant makes no argument as to the third and fourth factors, Mem. at 22, Reply at 1 – 2, both of which "implicate the ease of access to evidence and the convenience of witnesses," *Bank Brussels*, 305 F.3d at 130. Accordingly, the Court adopts the SEC's position, *see Guzzardi v. Affordable Hosp. Assocs., L.P.*, No. 06 CIV. 3338 (SCR), 2007 WL 9817916, at *2 (S.D.N.Y. June 21, 2007) (finding plaintiff established *prima facie* showing of

personal jurisdiction based on undisputed assertions), that these factors "are relatively neutral" because there are relevant witnesses and evidence in Brazil and in the United States.  Opp. at 24; *see Bank Brussels*, 305 F.3d at 130 (finding third and fourth factors to be neutral where relevant evidence was located in both forums).  And finally, the fifth factor does not weigh against the exercise of personal jurisdiction because Defendant points to no "shared social policies" between the U.S. and Brazil that would be undermined by this action.  *Bank Brussels*, 305 F.3d at 130; *see Stubos*, 634 F. Supp. 3d at 187 (observing that "[t]he burden is on the defendant to demonstrate" that the unreasonableness factors weigh against exercising personal jurisdiction).

For these reasons, the SEC has met its prima facie burden of establishing personal jurisdiction.

### b.  Failure to State a Claim

The SEC has adequately pleaded a Section 10(b) claim against Defendant.  The Court first finds, as a threshold matter, that Section 10(b) reaches Defendant's alleged conduct even though the relevant transactions in this case are extraterritorial.  The Court then finds that the SEC has adequately pleaded a violation of Section 10(b) because it has adequately pleaded scheme liability under Rule 10b-5(a).

### i.  Defendant's Conduct Falls within the Scope of Section 10(b)

The SEC can pursue a claim under Section 10(b) even though IRB's shares trade exclusively on a Brazilian exchange, Compl. ¶ 8, and even though the Complaint alleges no domestic transactions in IRB stock, *see id.* ¶ 44.  A threshold question in this case is whether Section 10(b) applies to conduct, like Defendant's, that occurred in connection with foreign transactions on a foreign stock exchange.  Defendant argues that it does not, Mem. at 7, because the Supreme Court said so in *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010).  *See id.* at 267 ("[I]t is in our view only transactions in securities listed on domestic exchanges, and domestic transactions in other

securities, to which § 10(b) applies."). The SEC argues that it is permitted to pursue claims under Section 10(b) with respect to extraterritorial conduct, Opp. at 9, because Section 929P(b) of the Dodd-Frank Act, enacted after *Morrison*, amended Section 27 of the Exchange Act to ensure United States courts' jurisdiction over Section 10(b) enforcement actions by the SEC predicated on specific extraterritorial transactions, *see* Pub. L. No. 111-203, 124 Stat. 1376, 1862 (2010), and that the amendment "would make no sense" if Section 10(b) did not also apply to those extraterritorial transactions, Mem. at 10 n.4. The Court agrees with the SEC, because Section 27 now affirmatively and unmistakably indicates that the Exchange Act's antifraud provisions apply to extraterritorial conduct that is the subject of an enforcement action by the SEC, including Defendant's conduct in this case.

### 1. Background

Before the Supreme Court's decision in *Morrison*, courts in this Circuit permitted the application of Section 10(b) to extraterritorial conduct when that conduct "occurred in the United States" or when it "had a substantial effect in the United States or upon United States citizens." 561 U.S. at 257 (quoting *SEC v. Berger*, 322 F.3d 187, 192–193 (2d Cir. 2003)). Those tests were known as the "'conduct' and 'effects' tests," *id.* at 258–59, and they were viewed as tests for determining a court's subject-matter jurisdiction, rather than the substantive scope of Section 10(b). *See id.* at 253–254.

In *Morrison*, the Supreme Court undid the conduct and effects tests, as well as their jurisdictional focus. The precise question before the *Morrison* Court was whether foreign purchasers of shares in an Australian bank on the Australian stock exchange could bring a private cause of action under Section 10(b). *Id.* at 250–52. The Court first held, as a threshold matter, that the extraterritorial application of Section 10(b) "is a merits question," rather than a jurisdictional one, because "to ask what conduct § 10(b) reaches is to ask what conduct § 10(b) prohibits." *Id.* at 254.

The district court did have jurisdiction, but only by virtue of Section 27, the Exchange Act's separate jurisdiction provision. *Id.*

The Court then held that, because the Exchange Act was "silent as to the extraterritorial application of [Section] 10(b)," the "canon or presumption" against applying statutes extraterritorially instructed that Section 10(b) only applied to "purchases and sales of securities in the United States." *Id.* at 266. Specifically, Section 10(b) reached "only transactions in securities listed on domestic exchanges, and domestic transactions in other securities." *Id.* at 267. Applying that rule, the Court dismissed the stockholder's complaint, because the defendants' conduct "involve[d] no securities listed on a domestic exchange, and all aspects of the purchases complained of . . . occurred outside of the United States." *Id.* at 273.

The Supreme Court issued *Morrison* on June 24, 2010. On July 21, 2010, less than one month later, Congress amended the Exchange Act to expressly provide for extraterritorial jurisdiction over SEC enforcement actions brought under Section 10(b). Section 929P of the Dodd-Frank Act, which Congress entitled "STRENGTHENING ENFORCEMENT BY THE COMMISSION [SEC]," added a part (b) to Section 27, the Exchange Act's "Jurisdiction of offenses and suits" provision, as follows:

> (b) EXTRATERRITORIAL JURISDICTION
> The district courts of the United States and the United States courts of any Territory shall have jurisdiction of an action or proceeding brought or instituted by the Commission or the United States alleging a violation of the antifraud provisions of this chapter involving—
> > (1) conduct within the United States that constitutes significant steps in furtherance of the violation, even if the securities transaction occurs outside the United States and involves only foreign investors; or
> > (2) conduct occurring outside the United States that has a foreseeable substantial effect within the United States.

Pub. L. No. 111-203, 124 Stat. 1376, 1862 (2010). The Dodd-Frank Act did not, however, amend Section 10(b) itself. *See* 15 U.S.C. § 78j(b). So while Congress plainly expanded district courts' jurisdiction over enforcement actions brought by the SEC alleging violations of Section 10(b),

Congress did not change the language of Section 10(b), which the *Morrison* Court had just held were limited to "domestic transactions," *id.* at 267.

## 2.    Extraterritoriality, Generally

The question in this case, therefore, is whether Congress's express grant of extraterritorial jurisdiction over Section 10(b) enforcement actions brought by the SEC, *see* 15 U.S.C. § 78aa(b)(1) (". . . even if the securities transaction occurs outside the United States and involves only foreign investors . . ."); 15 U.S.C. § 78aa(b)(2) (". . . conduct occurring outside the United States . . ."), provides a "clear, affirmative indication" that the scope of Section 10(b) also "applies extraterritorially" in the context of an SEC enforcement action. *RJR Nabisco v. Eur. Cmty.*, 579 U.S. 325, 337 (2016). Pertinent here is "a canon of statutory construction known as the presumption against extraterritoriality," which instructs that, "[a]bsent a clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application." *Id.* at 335 (citing *Morrison*, 561 U.S. at 255). Thus, "[w]hen a statute gives no clear indication of an extraterritorial application, it has none." *Morrison*, 561 U.S. at 255.

The Supreme Court "has established a two-step framework for deciding questions of extraterritoriality." *WesternGeco LLC. v. ION Geophysical Corp.*, 585 U.S. 407, 413 (2018). "The first step asks 'whether the presumption against extraterritoriality has been rebutted.'" *Id.* (quoting *RJR Nabisco*, 579 U.S. at 337). "It can be rebutted only if the text provides a 'clear indication of an extraterritorial application.'" *Id.* (quoting *Morrison*, 561 U.S. at 255). "If the presumption against extraterritoriality has not been rebutted, the second step . . . asks 'whether the case involves a domestic application of the statute,'" *id.* (quoting *RJR Nabisco*, 579 U.S. at 337), an inquiry which requires "looking to the statute's 'focus,'" *RJR Nabisco*, 579 U.S. at 337. In this case, there is no dispute that the second step is not satisfied. *See* Opp. at 12 & n.5 (conceding, through silence, Defendant's argument that his conduct was extraterritorial, and arguing that Section 10(b) covers

Defendant's conduct despite its extraterritoriality).  But it need not be.  If the first step is satisfied, then Section 10(b) may apply to Defendant's extraterritorial conduct.  *See Morrison*, 561 U.S. at 267 n.9 ("If § 10(b) did apply abroad, we would not need to determine which transnational frauds it applied to; it would apply to all of them (barring some other limitation)."); *RJR Nabisco*, 579 U.S. at 337–38 ("The scope of an extraterritorial statute . . . turns on the limits Congress has (or has not) imposed on the statute's foreign application, and not on the statute's 'focus.'").

### 3.  Relevant Case Law

In this Circuit, it remains an open question whether Section 929P alters *Morrison*'s conclusion that Section 10(b) only applies domestically.  The Second Circuit first described Section 929P(b), in dicta, as granting "extraterritorial jurisdiction over specific types of antifraud suits brought by governmental entities when the conduct at issue has particular types of relationships to the United States."  *Liu Meng-Lin v. Siemens AG*, 763 F.3d 175, 181 (2d Cir. 2014) (affirming district-court opinion that reasoned that "Section 929P(b) permits the SEC to bring enforcement actions for certain conduct or transactions outside the United States," *Meng-Lin Liu v. Siemens A.G.*, 978 F. Supp. 2d 325, 328 (S.D.N.Y. 2013)).  But while that description may have suggested an expansion of the scope of Section 10(b), the Second Circuit later described Section 929P(b), again in dicta, as simply being of "unclear" "import," because the *Morrison* decision that preceded Section 929P(b) had already "held that the Court there had jurisdiction to decide the case under the version of § 78aa then in force."  *Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 211 n.11 (2d Cir. 2014).

Several district courts in this Circuit have suggested, without holding, that enforcement actions brought by the SEC alleging violations of Section 10(b) may now reach extraterritorial conduct.  *See S.E.C. v. Tourre*, No. 10 CIV. 3229 KBF, 2013 WL 2407172, at *1 n.4 (S.D.N.Y. June 4, 2013) (applying *Morrison*'s domestic test because the conduct before the court occurred before the

Dodd-Frank amendment, but stating, in dicta, that "[b]ecause the Dodd-Frank Act effectively reversed *Morrison* in the context of SEC enforcement actions, the primary holdings of this opinion affect only pre-Dodd Frank conduct"); *see also Meng-Lin Liu*, 978 F. Supp. 2d at 328; *Sec. & Exch. Comission v. Caridi*, No. 3:23-CV-1243 (SVN), 2024 WL 4349015, at *6 & n.7 (D. Conn. Sept. 30, 2024) (noting the "tension" between *Morrison* and the Dodd-Frank amendment, but declining to decide the issue because the allegations met even the "more stringent" *Morrison* test).

The other circuit courts to address this issue have also concluded that Section 929P extended the reach of Section 10(b) to extraterritorial conduct in the context of enforcement actions brought by the SEC.  The parties' arguments focus on *Sec. & Exch. Comm'n v. Scoville*, in which the Tenth Circuit held that "the context and historical background surrounding Congress's enactment" of Section 929P(b) made "clear" that, "[n]otwithstanding the placement of the Dodd-Frank amendments in the jurisdictional provisions of the securities acts," "Congress undoubtedly intended that the substantive antifraud provisions should apply extraterritorially when the statutory conduct-and-effects test is satisfied."  913 F.3d 1204, 1218 (10th Cir. 2019).  The *Scoville* court noted that the extraterritoriality of Section 10(b) had been a jurisdiction question for forty years until *Morrison*, *id.* at 1217, and concluded that "the close proximity between the date when *Morrison* was issued and the date when the language of Dodd-Frank was finalized" meant it was far more likely that Congress enacted the extraterritorial expansion in Section 929P(b) against that jurisdiction-focused backdrop rather than the merits-focused backdrop "brought about by *Morrison*."  *Id.* (quoting *Sec. & Exch. Comm'n v. Traffic Monsoon, LLC*, 245 F. Supp. 3d 1275, 1291 (D. Utah 2017)).  Since *Scoville*, the First Circuit has also signaled that *Morrison*'s transactional test no longer applies to Section 10(b) enforcement actions brought by the SEC.  *Sec. & Exch. Comm'n v. Morrone*, 997 F.3d 52, 60 n.7 (1st Cir. 2021) ("We note that *Morrison*'s transactional test only governs conduct occurring before July 22, 2010.  Shortly after *Morrison* was decided, Congress amended the federal securities laws to 'apply

extraterritorially when the [newly-added] statutory conduct-and-effects test is satisfied.'" (quoting *Scoville*, 913 F.3d at 1218)).[3]

"Because the issue is undecided in this Circuit, the Court turns to the statute." *Tavarez v. Moo Organic Chocolates, LLC*, 623 F. Supp. 3d 365, 368 (S.D.N.Y. 2022). The Court finds that Section 27(b) provides a "clear, affirmative indication that," in actions brought by the SEC or the United States, Section 10(b) applies to extraterritorial conduct, *RJR Nabisco*, 579 U.S. at 337, including Defendant's conduct here.

### 4.  Section 10(b) Applies to Extraterritorial Conduct

In the Court's view, Section 10(b)'s extraterritorial application in SEC enforcement actions follows directly from the text of the Exchange Act. To start, there is no question that the broad language in Section 10(b) has the potential to encompass extraterritorial misconduct:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). The language in Section 10(b) would not have to change to provide a cause of action against Defendant in this case. It can encompass the use of "an instrumentality of interstate commerce or of the mails" between the United States and Brazil to manipulate or deceive investors in connection with IRB stock, a "security not so registered" on a U.S. national exchange.[4] *Id.*; *see*

---

[3] The First Circuit noted that the *Morrison* rule still applies to "conduct occurring before July 22, 2010," when the Dodd-Frank amendment went into effect. *Morrone*, 997 F.3d at 60 n.7. The conduct alleged in this case occurred in February and March of 2020, well after that cutoff date. Compl. ¶¶ 15–37.

[4] The *Morrison* Court reasoned that Section 10(b)'s reference to "securities *not* registered on domestic exchanges" still focused exclusively on "*domestic* purchases and sales," because Section 30(a) of the Exchange Act, unlike Section 10(b), contained a "clear statement of extraterritorial effect" that focused on the "foreign location of the *transaction*." 561 U.S. at 268 (emphasis in original) (citing 15 U.S.C. § 78dd(a)); *see also id.* at 265 (observing that Section 30(a)'s "specific extraterritorial application would be quite superfluous if the rest of the Exchange Act already applied to transactions on foreign exchanges"). After the Dodd-Frank amendment, however, the contrast between Section 30(a) and Section 10(b)

Compl. ¶¶ 24–30.  That is confirmed in the Exchange Act's definition of "interstate commerce," a term employed in Section 10(b), which includes "trade, commerce, transportation, or communication . . . between any foreign country and any State."  15 U.S.C. § 78c(a)(17).

The *Morrison* Court acknowledged that Section 10(b) could reach extraterritorial misconduct, *see* 561 U.S. at 255 (noting that "the Exchange Act is silent as to the extraterritorial application of § 10(b)."), but explained that the generalized language in Section 10(b) and Section 3(a)(17) does not rebut the "presumption against extraterritoriality" because it provides no "affirmative indication" of Section 10(b)'s extraterritorial reach, *id.* at 263–65; *see also Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 118 (2013) ("[I]t is well established that generic terms like 'any' or 'every' do not rebut the presumption against extraterritoriality.").  On its face, Section 10(b) captures extraterritorial conduct, but it does not affirmatively indicate an intention to extend so far, as required to overcome the presumption against extraterritorial application.  *See Morrison*, 561 U.S. at 262 ("On its face, § 10(b) contains nothing to suggest it applies abroad.").

Section 78aa(b), added after *Morrison*, *see* Pub. L. No. 111-203, 124 Stat. 1376, 1862 (2010), provides the "affirmative indication" of extraterritorial application that did not exist when the Court issued *Morrison*.  561 U.S. at 265.  As discussed, Congress expresses a statute's extraterritorial reach when it "gives a clear, affirmative indication that it applies extraterritorially."  *RJR Nabisco*, 579 U.S. at 337.  That indication does not have to be expressly stated.  *Id.* at 340.  A "dispositive" indication of extraterritorial reach may come from "context," *id.* at 339–40; *accord Morrison*, 561 U.S. at 265 (explaining that, in determining whether a statute applies extraterritorially, "[a]ssuredly context can be consulted"); *United States v. Epskamp*, 832 F.3d 154, 164 (2d Cir. 2016) (concluding that, regardless of "the text of [21 U.S.C. § 959(b)] itself," "the statutory scheme and the context of the statute

---

is far less pronounced.  The Exchange Act now grants jurisdiction over Section 10(b) enforcement actions with specific reference to the foreign location of the relevant transactions.  15 U.S.C. § 78aa(b)(1) (granting jurisdiction "even if the securities transaction occurs outside the United States and involves only foreign investors").

overcome the presumption against extraterritoriality"), including the extraterritorial reach of a merits statute's related jurisdictional provision. *Kiobel*, 569 U.S. at 117 ("Congress, even in a jurisdictional provision, can indicate that it intends federal law to apply to conduct occurring abroad."). In *RJR Nabisco*, for example, the Supreme Court found that although "Congress has not expressly said that" Section 1962(c) of the Racketeer Influence and Corrupt Organizations Act ("RICO") "applies to patterns of racketeering activity in foreign countries," Section 1962(c) applies extraterritorially to the extent that its predicate acts in other RICO provisions apply extraterritorially. 579 U.S. at 339–40. And in *Kiobel*, the Supreme Court observed, albeit in dicta, that 18 U.S.C. § 1091(e)'s provision of jurisdiction over the offense of genocide "regardless of where the offense is committed" if certain other conditions are met indicated that the offense itself "appl[ies] to conduct occurring abroad." 589 U.S. at 118.

Section 78aa(b), like the statute highlighted by the Supreme Court in *Kiobel*, clearly and affirmatively indicates Congress's intent to permit the SEC and the United States to bring enforcement actions for certain fraudulent conduct that occurs abroad. Section 27(b) confers jurisdiction over precisely defined conduct that is plainly extraterritorial, 15 U.S.C. § 78aa(b)(1) (". . . conduct within the United States that constitutes significant steps in furtherance of the violation, *even if the securities transaction occurs outside the United States and involves only foreign investors*, or . . . ") (emphasis added); 15 U.S.C. § 78aa(b)(2) (". . . *conduct occurring outside the United States* that has a foreseeable substantial effect within the United States.") (emphasis added), whenever an enforcement action "alleg[es] a violation of the antifraud provisions of [the Exchange Act]." 15 U.S.C. § 78aa(b). "[T]he antifraud provisions" of the Act plainly include those in Section 10(b). *See, e.g.*, *Sec. & Exch. Comm'n v. Jarkesy*, 144 S. Ct. 2117, 2125 (2024) ("[T]he three antifraud provisions are Section 17(a) of

the Securities Act, Section 10(b) of the Securities Act, and Section 206 of the Investment Advisers Act.").[5]

Section 27(b)'s grant of jurisdiction over Section 10(b) enforcement actions involving specific extraterritorial conduct is a "clear, affirmative indication" that Section 10(b)'s broad language may be applied to that conduct in an enforcement action brought by the SEC. *RJR Nabisco*, 579 U.S. at 337. Where possible, statutes must be interpreted "as a symmetrical and coherent regulatory scheme," *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 569 (1995)), with "all parts" "fit . . . into a harmonious whole," *id.* (quoting *FTC v. Mandel Brothers, Inc.*, 359 U.S. 385, 389 (1959)). It would have been pointless for Congress to define a "conduct" test, 15 U.S.C. § 78aa(b)(1), and an "effect" test, 15 U.S.C. § 78aa(b)(2), for jurisdiction over Section 10(b) enforcement actions if the scope of Section 10(b) never reached that conduct. Reading Section 10(b) to apply to conduct that meets Section 27(b)'s "conduct" or "effect" tests ensures that Section 27(b)'s demarcation of extraterritorial jurisdiction over Section 10(b) enforcement actions by the SEC is not "superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)); *accord Morrison*, 561 U.S. at 265 (adopting reading of statute that would not render other provisions in the statute superfluous); *United States v. Dai*, 99 F.4th 136, 139 (2d Cir. 2024) (same).

Moreover, if there were any "doubt about the meaning of [the] statute," Section 929P(b) of the Dodd-Frank Act, which added Section 27(b) to the Exchange Act, is entitled

---

[5] Section 10(b) is the Exchange Act's "primary antifraud provision," *In re Kingate Mgmt. Ltd. Litig.*, 784 F.3d 128, 137 (2d Cir. 2015) (internal quotation marks, alterations, and citation omitted), but there are others. Section 14(e), for example, prohibits "fraudulent, deceptive, or manipulative acts or practices . . . in connection with any tender offer," 15 U.S.C. § 78n(e), using language "modeled on the antifraud provisions of § 10(b) of the Act and Rule 10b–5," *Schreiber v. Burlington N., Inc.*, 472 U.S. 1, 10 (1985). Section 27(b) applies to every antifraud provision in the Exchange Act. *See* 15 U.S.C. § 78aa(b) (conferring jurisdiction over enforcement actions "alleging a violation of *the* antifraud *provisions* of this chapter" (emphasis added)). This case is only concerned with Section 27(b)'s application to Section 10(b).

"STRENGTHENING ENFORCEMENT BY THE COMMISSION [SEC]."  *Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) (noting that "the title of a statute and the heading of a section are tools available for the resolution of doubt about the meaning of a statute" (internal quotation marks and citation omitted)).  Section 27(b) is concerned with enforcement actions "alleging a violation of the antifraud provisions" of the Exchange Act.  15 U.S.C. § 78aa(b).  Section 10(b) is well-understood to be the Act's "primary antifraud provision."  *In re Kingate Mgmt. Ltd. Litig.*, 784 F.3d at 137 (quotation marks, alterations, and citation omitted).  If Congress did not intend for Section 929P(b) to strengthen the SEC's enforcement capabilities under Section 10(b), then it would have chosen a different title—one that acknowledged that the Exchange Act's "key weapon . . . for securing market integrity and investor confidence" was not actually being "[s]trengthen[ed]."  *Id.* (quotation marks, alterations, and citation omitted); Pub. L. No. 111-203, 124 Stat. 1376, 1862 (2010).  This too suggests that Section 10(b) applies extraterritorially where Section 27(b)'s conduct or effects test is met.  *See Moncrieffe v. Holder*, 569 U.S. 184, 200 (2013) (rejecting statutory reading that "leads to consequences Congress could not have intended").

For these reasons, the Court concludes that Section 27(b) provides a "clear, affirmative indication" that Section 10(b) applies to extraterritorial conduct when the SEC or the United States brings suit and the defendant's conduct meets the standards set out in Section 27(b).  *RJR Nabisco*, 579 U.S. at 337.[6]

### 5.  Section 10(b) Applies to Defendant's Alleged Conduct

---

[6] As discussed, Section 27(b) only applies to actions that are "brought or instituted by the Commission [SEC] or the United States."  15 U.S.C. § 78aa(b).  The Court therefore sees nothing in the amendment to Section 27(b) that rebuts the presumption against the extraterritorial application of Section 10(b) in the context of an action brought by any person other than the SEC or the United States.  That is consistent with Second Circuit precedent since the amendment, which has applied *Morrison*'s transactional test to actions brought by private litigants under Section 10(b), *see, e.g.*, *Cavello Bay Reinsurance Ltd. v. Shubin Stein*, 986 F.3d 161, 168 (2d Cir. 2021) (dismissing private action under Section 10(b) because the plaintiff "failed to plead a domestic application of § 10(b)"), and has held that "draw[ing] a distinction between private litigation and enforcement actions by the government . . . is not remarkable," *Loginovskaya v. Batratchenko*, 764 F.3d 266, 273 (2d Cir. 2014) (citing *Morrison*, 561 U.S. at 285 n.12 (Stevens, J., concurring)).

The SEC has alleged enough to plead that Section 10(b) applies to Defendant's alleged conduct because, at a minimum, Defendant's alleged conduct satisfies the test set out in Section 27(b)(1). As discussed, the Court has found that the jurisdictional tests in Section 27(b) define the scope of the extraterritorial application of Section 10(b) in SEC enforcement actions. Because Section 27(b) is disjunctive, Defendant's extraterritorial conduct only needs to meet one of its tests for Section 10(b) to apply. *See* 15 U.S.C. § 78aa(b).

Defendant's alleged conduct within the United States satisfies the standard in Section 27(b)(1) because it "constitute[d] significant steps in furtherance of" his violations of Section 10(b). 15 U.S.C. § 78aa(b)(1). Among other things, Defendant is alleged to have "exchanged dozens of text messages" while in New York with IRB's communications manager instructing her to spread the False Berkshire Story. Compl. ¶ 25. He also allegedly forwarded IRB's communication manager the Fake Shareholder Schedule for her to send to a journalist who had just asked for "the most up-to-date version of the IRB shareholder list." *Id.* ¶ 26. Defendant argues that these actions "were all but irrelevant" to Defendant's allegedly deceptive scheme, Mem. at 20, because Defendant took most of his alleged steps in furtherance of the scheme outside of the United States, *id.* at 19–20. But Section 27(b)(1) does not ask whether more of a defendant's violative steps occurred in the United States than elsewhere. It asks only whether the steps the defendant took within the United States are "significant." *See Sec. & Exch. Comm'n v. Liu*, 549 F. Supp. 3d 1087, 1092–93 (C.D. Cal. 2021), *aff'd sub nom. U.S. Sec. & Exch. Comm'n v. Liu*, No. 21-56090, 2022 WL 3645063 (9th Cir. Aug. 24, 2022) (finding defendant's "conduct in the United States constituted significant steps in furtherance of the securities violations" although significant conduct occurred "outside the United States"); *Traffic Monsoon*, 245 F. Supp. 3d at 1294 (similar). Drawing all reasonable inferences in the SEC's favor, Defendant's actions in New York were integral to the dissemination of the False Berkshire Story to at least one journalist, and potentially others. *See* Compl. ¶¶ 25 – 26. That suffices to allege

that Defendant's conduct within the United States "constituted significant steps in furtherance of" his Section 10(b) violations, 15 U.S.C. § 78aa(b)(1), and thus that his conduct falls within the ambit of Section 10(b). *See Scoville*, 913 F.3d at 1218 ("Congress undoubtedly intended that the substantive antifraud provisions should apply extraterritorially when the statutory conduct-and-effects test is satisfied.").

### ii.  The Complaint Adequately Pleads a Violation of Rule 10b-5

The Complaint adequately pleads a claim for violation of Rule 10b-5, Section 10(b)'s implementing rule, because it adequately pleads the elements of a claim under Rule 10b-5(a). *See* 17 C.F.R. § 240.10b-5(a); 15 U.S.C. § 78j(b). Rule 10b-5(a) makes it unlawful "[t]o employ any device, scheme, or artifice to defraud . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(a). To state a claim under Rule 10b-5(a), the SEC must allege that the defendant "(1) committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter." *See Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021) (setting forth requisite elements for private plaintiffs); *Sec. & Exch. Comm'n v. N. Am. Rsch. & Dev. Corp.*, 424 F.2d 63, 84 (2d Cir. 1970) (explaining that "reliance . . . is not an element of fraudulent representation under Rule 10b-5 in the context of an SEC proceeding"); *accord S.E.C. v. Lee*, 720 F. Supp. 2d 305, 325 (S.D.N.Y. 2010) (observing that, unlike private litigants, the SEC is not required to show "investor reliance, loss causation, or damages" to state a claim under Rule 10b-5). "And, of course, the deceptive or fraudulent scheme or activity must have occurred 'in connection with the purchase or sale of a[] security." *Plumber*, 11 F.4th at 105 (quoting 17 C.F.R. § 240.10b–5) (alteration in original).

"A 'manipulative or deceptive act' is 'some act that gives the victim a false impression.'" *Sec. & Exch. Comm'n v. Contrarian Press*, LLC, No. 16-CV-6964 (VSB), 2019 WL 1172268, at *4 (S.D.N.Y. Mar. 13, 2019) (quoting *United States v. Finnerty*, 533 F.3d 143, 148 (2d Cir. 2008)) (alterations

omitted).  That act need not include "a specific oral or written statement," because "[c]onduct itself can be deceptive."  *Finnerty*, 533 F.3d at 148 (quoting *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta*, 552 U.S. 148, 158 (2008)).

"Because scheme claims sound in fraud, they are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b)."  *Plumber*, 11 F.4th at 105.  Fed. R. Civ. P. 9(b) requires the SEC to "specify what deceptive or manipulative acts were performed, which defendants performed them, when the acts were performed, and the effect the scheme had on investors in the securities at issue."  *Id.* (internal quotation marks and citation omitted).

The Complaint adequately pleads that Defendant committed a manipulative or deceptive act in furtherance of a scheme to defraud.  The alleged scheme to defraud in this case, plainly enough, was the planting and dissemination of a fabricated story that Berkshire had made substantial investments in IRB, *e.g.*, Compl. ¶ 12, through methods designed to conceal Defendant's and IRB's involvement, *id.* ¶¶ 15, 25–26, in order to artificially bolster the value of IRB stock to investors, *id.* ¶¶ 1, 12.  Multiple courts have held that, at least in SEC enforcement actions, a secretive promotional campaign intended to inflate stock prices can constitute an actionable "scheme" under Rule 10b-5(a).  *See Contrarian Press*, 2019 WL 1172268, at *6 (sustaining SEC's Rule 10b-5(a) action arising from promotional campaigns for defendant's stock that were designed to appear as though they came from independent sources) (collecting cases); *see also Lee*, 720 F. Supp. 2d at 316–17 (sustaining Rule 10b-5(a) enforcement action arising from scheme to make false price quotes appear as though they came from independent third parties).

Moreover, despite Defendant's arguments, the alleged scheme was not one whose "primary purpose and effect . . . is to make a public misrepresentation or omission," such that the more stringent pleading requirements of Rule 10b-5(b) must be met.  Mem. at 14 (quoting *Sec. & Exch. Comm'n v. Kelly*, 817 F. Supp. 2d 340, 343 (S.D.N.Y. 2011)).  To the contrary, the primary purpose

and effect of the scheme, as alleged, was to disseminate a misrepresentation *without* publicly stating it. The dissemination of misstatements and omissions "is one example of something . . . that makes a violation a scheme" for purposes of Rule 10b-5(a).[7]  *SEC v. Rio Tinto*, 41 F.4th 47, 54 (2d Cir. 2022); *see also SEC v. Sequential Brands Grp., Inc.*, 20-cv-10471 (JPO), 2021 WL 4482215, at *6 (S.D.N.Y. Sept. 30, 2021) ("[A] plaintiff may make out a scheme liability claim by identifying manipulative or deceptive acts grounded in alleged misrepresentations or omissions.").  That is true even if, as Defendant argues, his alleged conduct would support a claim under Rule 10b-5(b), or any other subparagraph in Rule 10b-5.  Claims under the three subparagraphs in Rule 10b-5, though "distinct," *Sec. & Exch. Comm'n v. Rio Tinto plc*, 41 F.4th 47, 49 (2d Cir. 2022), admit of "considerable overlap" in the conduct they embrace, *Lorenzo*, 587 U.S. at 79 (sustaining claim under Rule 10b-5(a) where defendant disseminated material misrepresentations).

Moreover, according to the Complaint, Defendant took deceptive actions at each step in the alleged scheme.  Among other things, Defendant allegedly fabricated the False Berkshire Schedule,

---

[7] Defendant argues, on reply, that the Complaint does not allege that he "disseminated" the false information.  Relying on the Supreme Court's decision in *Lorenzo v. Sec. & Exch. Comm'n*, 587 U.S. 71 (2019), Defendant argues that "one can only 'disseminate' a material misstatement by re-publication of a misstatement," Reply at 3 (citing *Lorenzo*, 587 U.S. 71), and that while IRB's communications manager and public relations firm are alleged to have "republished" the misleading content that Defendant fabricated, Defendant himself did not "republish" it, *see id.* at 3–4.  Defendant's argument is waived because he raised it for the first time on reply despite clear allegations in the Complaint regarding dissemination. *See, e.g.*, Compl. ¶¶ 1, 12, 38; *Jackson Hole Burger, Inc. v. Est. of Galekovic*, 701 F. Supp. 3d 228, 236 n.4 (S.D.N.Y. 2023).  In any case, Defendant's argument is misplaced.  The "dissemination" of misstatements is not, as he argues, limited to republication.  Dictionaries define "dissemination" with reference to the spread—through whatever means—of material or ideas.  *See, e.g.*, *Disseminate*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/disseminate (defining "disseminate" as "to spread or give out something, especially news, information, ideas, etc., to a lot of people"); *Disseminate*, Merriam-Webster, https://www.merriam-webster.com/dictionary/disseminate (defining "disseminate" as "to spread abroad as though sowing seed" or "to disperse throughout").  The *Lorenzo* Court, consistent with these definitions, made clear that while the defendant before it had violated Rule 10b-5(a) by "disseminating" misleading content that he himself had not created, *see* 587 U.S. at 74–76, that was not the only way to "disseminate" misleading content, *see id.* at 78 (noting that a defendant could, in violation of Rule 10b-5(a), "disseminat[e]" misleading statements that he himself made).  Here, "dissemination" plainly encompasses Defendant's alleged conduct, as the aim and result of his conduct was to spread the False Berkshire Story in the press.  *See, e.g.*, Compl. ¶ 12.  And in any event, even assuming that IRB's communications manager and public relations firm were the only ones doing the disseminating, the Complaint alleges multiple deceptive actions that Defendant took in furtherance of that scheme.  *E.g.*, *id.* ¶¶ 18–21.  That, plus scienter, is all that is required to state a claim under Rule 10b-5(a) at this stage.  *See Lorenzo*, 587 U.S. at 79 (explaining that "dissemination of false or misleading material" comprises a "scheme"); *Contrarian Press, LLC*, 2019 WL 1172268, at *4 (requiring, to state a claim under Rule 10b-5(a), that a defendant act in furtherance of an alleged scheme, with scienter).

Compl. ¶ 19, and the False Berkshire Email, *id.* ¶ 21.  He instructed IRB employees to "leak" those documents and other false information to "a journalist who would be willing to publish it without attribution to IRB," *id.* ¶ 15, and to send them to a journalist who had "request[ed] . . . the most up-to-date version of the IRB shareholder list," *id.* ¶ 26.  These actions gave U.S. investors the "false impression" that IRB's stock was a good investment.  *Finnerty*, 533 F.3d at 148; Compl. ¶¶ 42, 44 (alleging IRB stock price increased by 6% while the false information was in the public domain and had not yet been corrected by Berkshire, and that U.S. investors bought IRB stock during this time).  That suffices, at this stage, to plead that Defendant took deceptive acts in furtherance of a scheme to defraud.  *See Contrarian Press*, 2019 WL 1172268, at *4.

The Complaint also adequately pleads scienter.  In the securities-fraud context, scienter is "a mental state embracing intent to deceive, manipulate, or defraud."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193–94 (1976)).  To adequately plead scienter, "the SEC must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'"  *Lee*, 720 F. Supp. 2d at 335 (quoting 15 U.S.C. § 78u–4(b)(2)).  Defendant does not dispute that the Complaint meets these standards.  *See* Mem. at 13; Reply at 3–6.  The Complaint alleges, among other things, that Defendant knowingly created the False Berkshire Story, Compl. ¶ 17, falsified several documents in support of that story, *id.* ¶¶ 18–21, and instructed IRB's communications manager to leak that information to the press without attribution to IRB, *id.* ¶ 38.  Those allegations support a strong inference that Defendant acted with an "intent to deceive, manipulate, or defraud," because that inference is "at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs*, 551 U.S. at 319.  Defendant has not offered, and the Court does not find, any reason why Defendant would take those alleged actions other than to deceive IRB investors.  Accordingly, scienter is

adequately pleaded.  *See Stream SICAV v. Wang*, 989 F. Supp. 2d 264, 277 (S.D.N.Y. 2013) (finding scienter adequately pleaded where defendant did not dispute scienter).

Finally, the Complaint adequately pleads that Defendant's misconduct occurred "in connection the purchase or sale of any security."  17 C.F.R. § 240.10b-5(a).  The Supreme Court has explained that the "in connection with" requirement in Section 10(b)—and thus in Rule 10b-5— "should be construed not technically and restrictively, but flexibly to effectuate [the statute's] remedial purposes."  *S.E.C. v. Zandford*, 535 U.S. 813, 819 (2002) (quotation marks and citation omitted).  "[I]t is enough that the fraud alleged 'coincide[s]' with a securities transaction."  *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006) (quoting *United States v. O'Hagan*, 521 U.S. 642, 656 (1997)).  "The requisite showing, in other words, is deception in connection with the purchase or sale of any security, not deception of an identifiable purchaser or seller."  *Id.* (quotation marks and citation omitted).  The Complaint makes this requisite showing by alleging that, among other things, U.S. investors "purchased shares of IRB stock while the false Berkshire information was in the public domain and had not yet been corrected by Berkshire," Compl. ¶ 44, and that IRB's stock price rose by "approximately 6%" during this time before plummeting "by more than 40%" when the False Berkshire Story was corrected, *id.* ¶ 42.  That suffices to state a claim at this stage even though the Complaint does not identify the U.S. investors who were deceived into purchasing IRB stock.  *See Merrill Lynch*, 547 U.S. at 85.

Defendant's argument that the Berkshire story, as presented in the public domain, was "not untrue," Mem. at 14, does not defeat the SEC's claim.  Defendant's primary argument is not that U.S. investors did not make purchases "in connection with" the introduction of the False Berkshire Story into the public domain, *see* Mem. at 17, but that those purchases could not have been made "in connection with fraudulent conduct" because the press qualified the story as a "rumor" upon publication, Mem. at 14–15; Reply at 4–5.  Defendant argues that the press's qualification of the

False Berkshire Story as a rumor severs the connection between the investors' purchases and Defendant's fabrication of the story. *See* Reply at 4–5. The problem with Defendant's argument, at a minimum, is that the Complaint does not allege that the press published the Berkshire story as a rumor.[8] To the contrary, the Complaint alleges that the "Brazilian media reported Berkshire's purported investment in IRB," Compl. ¶ 27, and that Bloomberg reported that IRB's stock price had risen "after a Brazilian newspaper 'reported [Berkshire] increased its stake in the firm," *id.* ¶ 28. At this stage, the Court accepts those "factual allegations as true, and draws all reasonable inferences in the [SEC's] favor," *Austin v. Town of Farmington*, 826 F.3d 622, 625 (2d Cir. 2016), and, accordingly, cannot conclude that the press qualified the False Berkshire Story as a rumor upon publication.

For these reasons, the Court finds that the SEC has adequately pleaded a Section 10(b) against Defendant.

### iii.   The Complaint Adequately Pleads a Claim for Aiding and Abetting IRB's Violations of Section 10(b)

The SEC's alternative claim that Defendant aided and abetted IRB in violating Section 10(b) is also adequately pleaded. "Section 20(e) of the Securities Exchange Act of 1934 allows the SEC, but not private litigants, to bring civil actions against aiders and abettors of securities fraud." *S.E.C. v. Apuzzo*, 689 F.3d 204, 211 (2d Cir. 2012) (citing 15 U.S.C. § 78t(e)). To state a claim for aiding and abetting securities fraud, the SEC must allege "(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) knowledge of this violation on the part of the aider and abettor; and (3) 'substantial assistance' by the aider and abettor in the achievement of the primary violation." *Id.* (quoting *SEC v. DiBella*, 587 F.3d 553, 566 (2d Cir. 2009)). To satisfy

---

[8] Defendant also argues that the "rumor" published in the press was "inconsistent with[] other publicly available information." Mem. at 4. In support, Defendant cites Berkshire's Form 10-K for the "fiscal year ended December 31, 2019," Dkt. No. 38-1, which, Defendant contends, identified Berkshire's insurance investments without identifying IRB, Mem. at 4. But the False Berkshire Story was published in late February 2020, and alleged a "recent[]" investment by Berkshire. Compl. ¶ 1. That "recent" investment was plausibly made outside the timeframe of Berkshire's Form 10-K for fiscal year ended December 31, 2019.

the "substantial assistance" element, the SEC must allege that the aider and abettor "in some sort associated himself with the venture, that he participated in it as something that he wished to bring about, and that he sought by his action to make it succeed." *Id.* (quoting *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938)) (alterations omitted).

Defendant does not seriously dispute the aiding-and-abetting claim. At most, Defendant disputes that IRB itself violated Section 10(b), but only on the grounds that the press "made" the False Berkshire Story rather than IRB. *See* Mem. at 14 (arguing that, because IRB is not "alleged to have publicly 'made'" a statement regarding the False Berkshire Story, "Defendant could not have aided and abetted" a violation of Section 10(b)). But unlike a claim under Rule 10b-5(b), a claim under Rule 10b-5(a) does not require that the defendant "make" a deceptive statement. *Lorenzo*, 587 U.S. at 82; *compare* 17 C.F.R. § 240.10b-5(a) (making it unlawful to "employ any device, scheme, or artifice to defraud"), *with* 17 C.F.R. § 240.10b-5(b) (making it unlawful to "*make* any untrue statement of a material fact or to omit to state a material fact . . ." (emphasis added)). The Complaint adequately pleads that IRB violated Rule 10b-5(a) because it alleges that IRB disseminated the False Berkshire Story to the press through several of its corporate officers, *e.g.*, Compl. ¶¶ 13 (alleging that Defendant disseminated the False Berkshire Story to the media), 31 (alleging that IRB's CEO spread the False Berkshire Story in a call with securities analysts, after which the "Brazilian media against reported the false Berkshire information"), and that IRB, through Defendant, had the requisite scienter, *id.* ¶ 39 (alleging that Defendant was "IRB's most senior financial officer," and thus that Defendant's knowledge "may be imputed to IRB"); *In re Marsh & Mclennan Companies, Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 481 (S.D.N.Y. 2006) ("[C]ourts have readily attributed the scienter of management-level employees to corporate defendants") (collecting cases).

Defendant does not dispute the other elements of the SEC's aiding-and-abetting claim. The Complaint adequately pleads that Defendant had "knowledge" of IRB's alleged violations of Rule

10b-5(a), *Apuzzo*, 689 F.3d at 211, because Defendant orchestrated the misconduct attributable to IRB. *See, e.g.*, Compl. ¶ 39. And the Complaint pleads Defendant's "substantial assistance" in the achievement of IRB's violations, *Apuzzo*, 689 F.3d at 211, for the same reasons. Accordingly, the SEC has adequately pleaded an aiding-and-abetting-securities-fraud claim against Defendant. *See Sec. & Exch. Comm'n v. Honig*, No. 18 CIV. 8175 (ER), 2020 WL 906383, at *12 (S.D.N.Y. Feb. 25, 2020) (finding elements of aiding-and-abetting-securities-fraud claim adequately pleaded where defendant did not dispute them).

## IV.    CONCLUSION

For the reasons stated herein, Defendant's motion to dismiss under Fed. R. Civ. P. 12(b)(2) and Fed. R. Civ. P. 12(b)(6) are DENIED.

SO ORDERED.

Dated: December 21, 2024

_____
GREGORY H. WOODS
United States District Judge